# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

BRETTE TINGLE

VERSUS

TROY HEBERT, IN HIS INDIVIDUAL &
OFFICIAL CAPACITY AS THE
COMMISSIONER OF THE OFFICE OF
ALCOHOL AND TOBACCO CONTROL
OF THE LOUISIANA DEPARTMENT
OF REVENUE

CIVIL ACTION

NO. 15-626-JWD-EWD

## RULING AND ORDER

This matter comes before the Court on the *Defendants' Motion for Partial Summary Judgment* (Doc. 116) filed by Defendants Troy Hebert and the Office of Alcohol and Tobacco Control of the State of Louisiana ("ATC") (collectively, "Defendants"). Plaintiff Brette Tingle opposes the motion. (Doc. 137.) Defendants have filed a reply. (Doc. 145.) Oral argument is not necessary. For the following reasons, the Defendants' motion is granted in part and denied in part.

## I.    Introduction

Plaintiff is a former employee of the ATC. Plaintiff was terminated from his job by Troy Hebert, who at one time served as head of the ATC.

Plaintiff subsequently filed this suit against the ATC and Hebert asserting a number of causes of action. These include (1) retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) and 42 U.S.C. §§ 1981, 1983 (Doc. 62 at 3, 13); (2) invasion of privacy under the Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution (Doc. 62 at 14–15); and (3) defamation under Louisiana state law (Doc. 62 at 15–20).

Defendants have filed a couple of motions to dismiss (Docs. 10, 68), and the Court has granted these motions in part and denied them in part (Docs. 32, 90). After these rulings, the following claims have survived: (1) against Troy Hebert, Plaintiff's claims for (a) retaliation under §§ 1981, 1983 (Doc. 32 at 2); (b) invasion of privacy under the federal and state constitutions (Doc. 32 at 2–4); and (c) defamation (Doc. 32 at 4–6); and (2) against the ATC, Plaintiff's claim for retaliation under Title VII (Doc. 62 at 13–14; Doc. 90 at 2).

Defendants have filed the instant motion seeking the dismissal of three discrete sets of claims. First, Defendants ask the Court to dismiss Plaintiff's claim that he was retaliated against "because he participated as a witness in the *Randall Kling* litigation presently pending in the 19th Judicial District Court." (Doc. 116-1 at 2; Doc. 62 at 14.)

Second, Defendants argue that the Court should dismiss Plaintiff's claim that Defendants retaliated against him by way of certain investigations the ATC conducted. (Doc. 116-1.) Specifically, Defendants maintain that the Plaintiff cannot show a prima facie case of retaliation because the following are not adverse employment actions: (1) investigating Plaintiff for the ATC's alleged lack of compliance with the DEA and for purportedly missing money; (2) investigating Plaintiff for allegations that he placed Agent Lorre Claiborne in danger; and (3) investigating Plaintiff's wife, Traci Tingle, for "allegedly falsifying state documents" related to an ATC office in Vidalia, Louisiana. (Doc. 116-1 at 5; Doc. 62 at 8–10.)

And third, Defendants contend that one of Plaintiff's defamation claims should be dismissed. Specifically, Plaintiff alleges in his Amended Complaint:

> Contemporaneous with the termination of the Plaintiff, Troy Hebert released statements to the press and to agents with the ATC that his vehicle had been set on fire. In an interview with a New Orleans news outlet, WVUE, on August 19, 2015, Troy Hebert maliciously stated that if a person was to "connect the dots" it would be clear who vandalized the vehicle, as a way of implicating the Plaintiff without saying the Plaintiff's name. While it is apparently true that Troy's vehicle had been

set on fire, Troy Hebert had no evidence that the Plaintiff had committed this crime. Troy Hebert did know, or certainly should have known, that the temporal proximity of his statements and the termination of the Plaintiff carried false and defamatory implications. These implied accusations are false and defamatory *per se*.

(Doc. 62 at 16.)  Defendants argue in the instant motion that Hebert never said "connect the dots" and made no such defamatory suggestion.  (Doc. 116-1 at 2.)

Having carefully considered the law, facts in the record, and arguments and submissions of the parties, the Court will grant summary judgment on the first and third issues but deny on the second.  As to the first (the *Randall Kling* litigation), Plaintiff concedes that this claim should be dismissed (Doc. 137 at 1–3), so it need not be discussed further.

As to the second issue (retaliatory investigations), to demonstrate retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington N. and Sante Fe R.R. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (internal citations omitted).  Relying on Fifth Circuit precedent, this Court has twice held that mere job scrutiny does not rise to the level of an adverse employment action. Plaintiff urges that these facts are unique. The Court agrees.  Cases in other jurisdictions have indicated that investigations can, under certain circumstances, constitute adverse employment actions.  The same finding is appropriate here. As a result, the Court finds that Plaintiff has demonstrated a question of fact as to whether the investigations in this case constitute adverse employment actions, and summary judgment on these claims is thus denied.

As to the third issue (defamation related to the vandalism and destruction of ATC vehicles), the Louisiana Supreme Court has recognized that "[a] pure statement of opinion, which is based totally on the speaker's subjective view and which does not expressly state or

imply the existence of underlying facts, usually will not be actionable in defamation[.]" *Bussie v. Lowenthal*, 535 So. 2d 378, 381 (La. 1988) (citation omitted). "That is because falsity is an indispensable element of any defamation claim, and a purely subjective statement can be neither true nor false." *Id.* " '[T]he crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.' " *Id.* (citation omitted). "In order for a statement of opinion to be actionable in defamation on the ground that it gives rise to a defamatory factual inference, the factual inference created by the statement must be ascertainable by a reasonable person with some degree of certainty." *Id.* at 382–83.

Here, all of the statements Hebert actually made that Plaintiff complains of—both in Hebert's television interview and in other media—constitute mere opinion. No reasonable jury would conclude that Hebert's statements (which do not include the "connect the dots" language) express or imply the existence of underlying facts, and his words are too unspecific and general to be actionable defamation under the *Bussie* standard. Consequently, Plaintiff's defamation claim related to the vandalism, shooting, and torching of ATC vehicles is dismissed.

## II.     Relevant Factual Background

### A.  Plaintiff's Retaliation Claims Related to Defendants' Investigations

Troy Hebert initiated an investigation to take action to obtain any money that ATC should have collected from the DEA. (Defendants' Statement of Material, Undisputed Facts In Support of the Motion for Partial Summary Judgment ("DSMUF"), Doc. 116-12 at 2; Plaintiff's Response to Defendants' [SMUF] ("PRDSMUF"), Doc. 137-1 at 1.)  Specifically, Hebert testified that Tingle came to him and "said that there was $100,000 in money that . . . could be

gotten to ATC." (Doc. 116-6 at 2–3.)  Hebert purportedly said, "Okay, well, then go get the money[.] . . . But it never happened. . . . [Hebert didn't] think [they] ever got the money[.]" (Doc. 116-6 at 3.)  Hebert testified that he did not "recall telling Mr. Louis Thompson to go get the money. . . . [He] recall[ed] telling Mr. Brette Tingle to go get the money; and if that included getting Mr. Louis Thompson involved, then that's the way it should be.  But . . . Tingle knew where the last money was." (Doc. 116-6 at 4.)

Hebert was asked if he followed up on the collection of the money, and he replied: "I asked about it along the way, but like so many other things that you give them, these assignments, and they don't do them." (Doc. 116-6 at 5.)  Hebert stated that he would ask Tingle about the project, and Hebert would reply, " 'He's is [sic] working on it,' or something like that." (Doc. 116-6 at 6.)  But, ultimately, Hebert said his only actions to collect the money were "[a]ssigning it [to Tingle] and following up with him[.]" (Doc. 116-6 at 6.)

Additionally, Hebert testified that Plaintiff's wife, Traci Tingle, did inventory for the ATC every year. (Doc. 116-6 at 12.)  When she left the ATC, someone "did an inventory list and found out that there was some discrepancies about some . . . office furniture located in Vidalia." (Doc. 116-6 at 12.)  Hebert said he asked Director Larry Hingle to "look into it." (Doc. 116-6 at 13.)

Troy Hebert also initiated an investigation into allegations made by Lorre Claiborne that she felt endangered by being assigned to work in uniform at convenience stores and other Alcohol Beverage Outlets (ABOs) where she previously worked undercover. (DSMUF, Doc. 116-12 at 2; PRDSMUF, Doc. 137-1 at 1.)  Frank Perez, an outside attorney hired by the ATC, conducted the investigation and reported his findings. (DSMUF, Doc. 116-12 at 2; PRDSMUF,

Doc. 137-1 at 1.)  There was no finding of any wrongdoing by Brette Tingle. (DSMUF, Doc. 116-12 at 2; PRDSMUF, Doc. 137-1 at 2.)

Meanwhile, Plaintiff testified as to the number of ways he believed he was retaliated against with respect to the investigations.  He stated that, first, there were "[n]o proper investigations. No interviews. [He] was never given the opportunity to answer questions." (Doc. 137-4 at 63.)  Second, Plaintiff stated that "things were withheld so that the report wouldn't be an accurate reflection of [his] time." (Doc. 137-4 at 63.)  That is, the report was not, in his opinion, accurate. (Doc. 137-4 at 63.)  Third, Plaintiff maintains that "Hebert asked for an investigation in October about threats made . . . about Lorre Claiborne." (Doc. 137-4 at 63.)  Plaintiff says that "nothing came, no disciplinary action was taken against him for" this. (Doc. 137-4 at 63.) Of this Claiborne investigation, Tingle testified: "The result of that, nothing happened to Brette Tingle." (Doc. 116-5 at 3.)  As to the fourth and fifth items, Plaintiff testified:

> That the OIG's office conducted an investigation and found that I did nothing wrong.  The results were not taken from Troy Hebert positively and he went to the Louisiana State Police and demanded that they do an investigation.  They contacted the OIG's office and was satisfied with the report and that still did not satisfy Troy Hebert and he went through with the second termination after I was – after the – we were sequestered and then put under sequestration from the hearing officer not to discuss anything rescinded that and then move with the second termination in the public release of everything to the public to law –

(sic) (Doc. 137-4 at 63–64.)  When asked about the investigation brought to the OIG and Louisiana State Police, Plaintiff said it was retaliatory "that [Hebert] would not accept the OIG's report by a legit investigative agency and went to state police and demanded they do something when they agreed [with] the OIG's report and didn't pursue anything, it was rescinded and more things were piled on." (Doc. 137-4 at 64.)

Lastly, Plaintiff testified that he was retaliated against by Hebert "calling him and telling him we're going to investigate [Tingle's] wife for falsifying public documents and get[] the

legislative auditor involved because she falsified public documents that there was an office in Vidalia with equipment." (Doc. 116-5 at 5.) Tingle admitted, however, that his wife was not terminated and received no pre-termination notice, but he said this was "because she didn't give [Hebert] a chance. She retired." (Doc. 116-5 at 6.)

According to the disciplinary letters submitted by the Defendants, Plaintiff was not terminated for the violations concerning the DEA money, Lorre Claiborne's complaints, or the office furniture at the ATC's office in Vidalia. (Docs. 116-8.)

### B. Plaintiff's Defamation Claim

Hebert gave an interview to WVUE on August 19, 2015. (Doc. 116-9.) Before providing a transcript of that interview, two facts referenced in the interview are worth noting.

First, Plaintiff and Jedd Faulk, Plaintiff's subordinate employee, exchanged text messages on May 18, 2012, concerning a former ATC Agent named Daniel Abdella. (Doc. 116-5 at 10.) After discussing how Abdella resigned, Plaintiff said, in response to the question of where Abdella was going, "Not in law enforcement. Said something spiritual. Probably joining the Jihad." (Doc. 116-10 at 3.) Faulk then said, "yikes, maybe he will suicide bomb maniac's office." (Doc. 116-5 at 11.) Plaintiff replied, "I'm hoping," though Plaintiff testified that he did so "in gest." (Doc. 116-5 at 10–11.) Faulk responded, "Wasn't expecting him as our Manchurian candidate but he'll do." (Doc. 116-5 at 10–11, Doc. 116-10 at 3.) Plaintiff then said: "I take him . . . I'll even accept any collateral damage. . . . I will just stay away from that side of the office." (Doc. 116-5 at 11.) Faulk said, "a few sticks of dynamite ain't going to reach our office," and Plaintiff responded: "nope. We would be good." (Doc. 116-5 at 11.) Plaintiff again testified that he did so "in gest." (Doc. 116-5 at 11.)

Second, Defendants submit a copy of a Facebook post in which individuals were discussing seeing Hebert at a restaurant. (Doc. 116-11.) One of the individuals (whom Defendants represent is a former ATC employee) said: "That's enough to make me lose my lunch! Oh oh shoot him!!! That will make the world happier and a better place!!!!" (Doc. 116-11 at 2.)

Returning to the key issue, the following is a transcript of the WVUE interview:

[*Anchor, on camera*:] "Threatening texts and payroll fraud—some of the reasons why the ATC says one of its supervisors lost his job. Brett Tingle's firing comes as police investigate a number of crimes involving several Alcohol and Tobacco vehicles."

[*Reporter, off camera, with a photo of Brett Tingle in the center foreground and a blurred image of the reporter and Hebert in the background :*] "Commissioner Troy Hebert calls the alleged action of the former supervising ATC agent 'alarming and extremely disturbing.' "

[*Reporter, off camera, with various images in the background*:] "The agency says Brett Tingle is accused of pay roll fraud and breaking ATC policy by having a secondary job with the Harbor Police. The ATC also claims Tingle used his state issued cell phone to text racist and threating messages."

[*Hebert, on camera*:] "We live in a day and age today that we cannot accept this from regular people. We certainly cannot accept it from law enforcement who is (sic) commissioned officers who are given guns and weapons.

[*Reporter, off camera, with soundless video of Hebert looking at two pieces of paper*:] "The ATC released some of the text messages. In one conversation discussing the resignation of an agent of Middle Eastern descent, a former ATC agent says:

[*Graphic displayed with headline "ATC SUPERVISOR FIRED" and sub-headline "THREATENING TEXTS FOUND", with two frames below this. In the left frame is a picture of Tingle. In the right frame are the words:*

*FORMER ATC EMPLOYEE:*
*"YIKES. MAYBE HE'LL SUICIDE BOMB MANIAC'S OFFICE."*

*BRETTE TINGLE:*
*"I'M HOPING!!!"*

[*Reporter, off camera, reads from the text messages*]

[*Reporter, still off camera, continues, with close up of Hebert talking*:] "Commissioner Hebert says he is the maniac the former agent is referring to."

[*Hebert, on camera:*] "This is just an excerpt of the text messages and it is very obvious to who they are alluding to." (sic)

[*Reporter, off camera, with inaudible video of Hebert talking*] "Hebert says he has thick skin, but it is a bit unnerving and concerning. [*photograph of Hebert displayed, with police lights unfocused in the background, followed by image of vehicle with gas cap removed and with either dust or burn marks on it.*] Tingle's firing comes just two days after someone stole Hebert's state issued truck from in front of his home and set it on fire. [*successive images of vehicles with holes in the windows, then a shattered windshield*] Before that, someone shot up six unmarked ATC vehicles in a parking garage at the agency's Baton Rouge headquarters."

[*Hebert, on camera*:] "Look I have been in politics for 25 years. I have been called way worse than a maniac, you know. That does not bother me. What I guess the concern comes at today is with, you know, some of the recent activity just happened with my vehicle and in the past vehicles getting shot up. Um, I am not trying to say any of this is connected, what I am saying is I do not want my family or me to be the story that something bad happens and then the media is gonna simply see these things and ask well you saw all the evidence, you saw the clues, why didn't you all do something about it and prevent it. I mean we all can be Monday morning quarterbacks. Ok, I do not want to wait till Monday morning to take care of it."

[*Reporter, off camera, with soundless video of reporter and Hebert displayed:*] "Hebert says he is hoping there is no connection between the recent happenings, but he isn't taking any chances."

[*Hebert, on camera*:] "That's gonna be something for the investigators to determine, but I will tell you this, that there is numerous number of text messages. There is one alluding to about not only bombing my office, but about shooting me. There is one where they have a picture of me in a restaurant and some of the comments and suggestions is just shoot him, you know . . . When you add all those things together . . . if you are smart you are going to be concerned."

[*Reporter, off camera, with video of city displayed*:] "Hebert says all of the agency's findings have been turned over to State and Federal authorities."

[*Hebert, on camera:*] " I am concerned, and I am mostly concerned for my family because we all know too often that things happen that you and I would never dream of. And I love this job, and it has been very rewarding to me, but it is not worth anything happening to my family nor me. I did not sign up for that part"

[*Reporter, on camera and in studio, with picture of Tingle displayed with a caption "ATC SUPERVISOR FIRED":*] "The Commissioner says he is investigating whether any of the agency's cases will be effected because of the former supervisor."

(Doc. 116-9.)

Plaintiff points to two other allegedly defamatory statements made in connection with the acts of vandalism. First, an August 25, 2015, article by WWL entitled "ATC agent fired over vulgar/threatening text messages" discusses the various grounds for Tingle's firing. (Doc. 137-3) The article then states:

Hebert's state vehicle was stolen at his home over the weekend and somebody apparently tried to set it on fire. He says it will be up to the investigators to determine if the incident is connected to Tingle.

"We've given them all of this information so that will be up to investigators to determine if there's a connection," said Hebert.

(Doc. 137-3.)

Second, a former attorney of the ATC named Brian DeJean testified about certain press releases that Hebert posted on the ATC website. (Doc. 137-5 at 156.) DeJean stated: "One I know in particular had to do with the theft of his vehicle and . . . I don't recall whether he named him by name, but there was a heavy inference that Brette Tingle was the culprit. I believe he may have used Brette Tingle's picture in that." (Doc. 137-5 at 156.)

### III. Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (internal citations omitted). The

non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or

by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)

(citations and internal quotations omitted). "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S. Ct. at 1356. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of
> the witnesses, weigh the evidence, or resolve factual disputes; so long as the
> evidence in the record is such that a reasonable jury drawing all inferences in favor
> of the nonmoving party could arrive at a verdict in that party's favor, the court must
> deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263 (5th Cir. 1991) (internal

citations omitted).

### IV.     Discussion

#### A.   Retaliation Related to Randall Kling

As stated above, Plaintiff has conceded that he has no retaliation claim under Title VII or

§§ 1981 and 1983 regarding the *Randall Kling* litigation. (Doc. 137 at 1–3.)  Accordingly, this

claim is dismissed.

#### B.   Retaliation Related to Defendants' Investigations

##### 1. Parties' Arguments

###### i.     Defendants' Original Memorandum (Doc. 116-1)

Again, Defendants seek dismissal of three retaliation claims: (1) the investigation into the

uncollected DEA funds; (2) the investigation into Lorre Claiborne's allegations; and (3) the

investigation into the alleged office furniture in Vidalia.  Defendants contend that there is no

question of fact that (1) Hebert never followed through on the DEA investigation; (2) there was

no finding of wrongdoing by Plaintiff in the Lorre Claiborne-related investigation; and (3) "there was no disciplinary action, termination or other adverse employment action taken against [Tingle and his wife] as a result of the investigations." (Doc. 116-1 at 5–6.)

Defendants correctly note that the key question under Title VII and § 1981 retaliation claims is whether the action was "materially adverse" such that it might "have dissuaded a reasonable worker from making or supporting a charge of discrimination (Doc. 116-1 at 6 (citing, *inter alia*, *Burlington N.*, 548 U.S. at 68, 126 S. Ct. at 2415).) Defendants argue that the Fifth Circuit has "repeatedly held run-of-the-mill employment actions do not constitute a materially adverse action under the *Burlington Northern* standard" (Doc. 116-1 at 7 (citations omitted).)

Following a lengthy string cite (Doc. 116-1 at 7–9), Defendants assert that "[t]here do not appear to be any cases holding an employer's requesting or conducting a workplace investigation—especially without any resulting employment consequences such a[s] [a] demotion, termination or transfer – constitutes a materially adverse employment action." (Doc. 116-1 at 9.) Defendants state that "the jurisprudence indicates that, standing alone, a workplace investigation would not constitute a materially adverse employment action." (Doc. 116-1 at 9.) Defendants then discuss case law from this Court saying that job scrutiny is not actionable. Defendants conclude: "Thus, because no detrimental job action, such as demotion, transfer, suspension or termination, was taken against Tingle as a result of any of the three detailed investigations above . . . , the investigations into these matters were not in and of themselves materially adverse employment actions." (Doc. 116-1 at 10.)

### ii.    Plaintiff's Opposition (Doc. 137)

After discussing the *Burlington Northern* standard and certain cases that have found adverse employment actions in other situations, Plaintiff asserts:

> Here, the Plaintiff does not allege that mere investigation of an employee, in and of itself, constitutes an "adverse employment action." Instead, he has testified: (i) that the investigations into his behavior were improper and one-sided, (ii) that the Defendant withheld information in his reports relating to the investigations in order to increase the chances of finding wrongdoing, (iii) that the investigations arose from baseless accusations, (iv) that after the Plaintiff was cleared of wrongdoing, the Defendant was not satisfied with this finding and demanded the state police investigate the matter further, and (v) that the Defendant launched a further baseless investigation of the Plaintiff's wife.
>
> These are not "[p]etty slights or minor annoyances that often take place at work and that all employees experience." See *Burlington N. & Santa Fe Ry. Co. v. White, supra.* at 68. If "all" ATC employees were subjected to this form of treatment, then no reasonable person would choose to work there. These allegations, if accepted as true, make the investigations, and the Defendant's related conduct, far more "adverse" than a standard, routine investigation.

(Doc. 137 at 4.)

Plaintiff then explains that the key question is whether a *reasonable* ATC employer would have been dissuaded from opposing Defendants' actions; "even if an employer's action does not affect the employee's wages or job status, is within the employees' job description, and is wholly unrelated to employment," it can still be impressible retaliation if "the action would be perceived as negative by a reasonable person in the individual's circumstances and has more than a trivial effect on that individual." (Doc. 137 at 5.)

Plaintiff maintains that a reasonable person in his shoes would be so dissuaded. As a result, according to Plaintiff, the above investigations constitute adverse employment actions.

### iii.    Defendants' Reply (Doc. 145)

Defendants respond that Plaintiff has cited to no court "holding an internal investigation alone constitutes a materially adverse employment action." (Doc. 145 at 2.)  Defendants also argue that Plaintiff misstates the *Burlington Northern* standard.  According to Defendants, the question is not whether the employment action would be "perceived as negative by a reasonable person in the individual's circumstances and has more than a trivial effect on that individual". (Doc. 145 at 2 (quoting Doc. 137 at 5).).  Rather, the question is whether the action is "materially adverse, which in this context means it well might have dissuaded a reasonable worker form (sic) making or supporting a charge of discrimination." (Doc. 145 at 2 (quoting *Burlington*, 438 U.S. at 67).)  The Supreme Court said that it spoke "of material adversity because [the Court] believe[d] it [was] important to separate significant from trivial harms." (Doc. 145 at 2 (citing *Burlington*, 438 U.S. at 68).) The standard is objective.

Defendants do not dispute that the *results* of an investigation can be an adverse employment action; here, Defendants concede that there's a jury question as to whether the result of the investigation—Plaintiff's termination—was retaliation.  But Defendants argue that "the ATC's investigations into other alleged wrongdoing by Plaintiff (and his wife who was also employed by the ATC) which did not result in termination, demotion, suspension, etc., do not constitute a 'materially adverse employment action' because there was no resulting action taken against Plaintiff (or his wife) on these matters." (Doc 145 at 3.)  Defendants state: "Therefore, the underlying investigation—whether Plaintiff felt it was fair, unfair, one-sided, incomplete, baseless and/or inept—is not the adverse employment action sufficient to state and maintain its own independent claim of retaliation." (Doc. 145 at 3.)  Defendants conclude by urging a policy

reason—the danger of tying employer hands from conducting investigations "for fear that the investigation alone could result in a retaliation claim." (Doc. 145 at 3.)

### 2. Analysis

#### i. Retaliation Standard and Adverse Employment Actions Generally

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "To establish a prima facie case of retaliation under. . . Title VII, a plaintiff must show that (1) []he participated in an activity protected under the statute; (2) [his] employer took an adverse employment action against [him]; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *McCoy v. City of Shreveport,* 492 F.3d 551, 556–57 (5th Cir. 2007)). This motion focuses on the second requirement and the standard set forth by the Supreme Court in *Burlington Northern*.

According to this case, the antiretailation provision of Title VII "extends beyond workplace-related or employment related retaliatory acts and harm." *Burlington N.*, 548 U.S. at 67, 126 S. Ct. at 2414. Phrased another way, "the challenged actions" need not be "related to the terms or conditions of employment." *Id.*, 548 U.S. at 70, 126 S. Ct. at 2316. Unlike the antidiscrimination provision, retaliation actions are not limited to "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating." *Id.*, 548 U.S. at 60, 67, 126 S. Ct. at 2410, 2414.

Nevertheless, "the antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.*, 548 U.S. at 67, 126 S. Ct. at 2414. To demonstrate retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.*, 548 U.S. at 68, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

The standard is "*material* adversity" because it is "important to separate significant from trivial harms. Title VII . . . does not set forth 'a general civility code for the American workplace.' " *Id.* (emphasis in original) (internal citations omitted). As *Burlington Northern* explains:

> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. [*Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)] It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid*. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual § 8, p. 8–13.

*Id.*

The material adversity standard is also that of a "*reasonable* employee" because "the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.*, 548 U.S. at 68–69, 126 S. Ct. at 2415 (emphasis in original).

The *Burlington Northern* standard is set forth in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters." *Id.*, 548 U.S. at 69, 126 S. Ct. at 2415.  For example, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*, 548 U.S. at 69, 126 S. Ct. at 2415–16.

### ii.    Investigations As Adverse Employment Actions

Accordingly, "chastisement by superiors and ostracism by co-workers 'do not rise to the level of material adversity but instead fall into the category of "petty slights, minor annoyances, and simple lack of good manners" that the Supreme Court has recognized are not actionable retaliatory conduct.' " *Butler v. Exxon Mobil Corp.*, 838 F. Supp. 2d 473, 496 (M.D. La. 2012) (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009)).  Consequently, this Court has held that, "as a matter of law, Plaintiff's allegations of workplace criticism and job scrutiny are not adverse employment actions for purposes of his retaliation claims." *Id.*; *McKinney v. Louisiana*, No. 12-789, 2014 WL 2600216, at *4 (M.D. La. June 10, 2014) (relying on *Butler*, granting an employer's motion for summary judgment in part, and finding that "the plaintiff's present allegations centered on job scrutiny and chastisement from her superior . . .  do not rise to the level of an adverse employment action for purposes of a Title VII retaliation claim.").  Defendants rely on these and other cases to argue that, as a matter of law, investigations can never rise to the level of adverse employment actions.

The Undersigned disagrees.  While it is true that mere job scrutiny does not rise to the level of an adverse employment action, this case does not involve mere "job scrutiny."  Plaintiff's

testimony demonstrates that the investigation were "improper," that Plaintiff was "never given the opportunity to answer questions," that things were "withheld" so that the report would not be "accurate," that "nothing came" from the investigations, and that Defendants even referred Plaintiff to the police for investigation despite a finding of no-wrongdoing by Defendants. (Doc. 137-4 at 63–64.) Construing the evidence in a light most favorable to the Plaintiff and drawing inferences in his favor, the Court finds these particular investigations involve instances where the Defendants specifically and unfairly targeted the Plaintiff in what amounted to sham investigations. (Doc. 137-4 at 63–64.) A reasonable juror could find from the evidence that these investigations "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " and that they went well beyond "petty slights, minor annoyances, and simple lack of good manners." *Burlington N.*, 548 U.S. at 68, 126 S. Ct. at 2415 (citations omitted). Accordingly, under these particular circumstances, the Court finds that there is a question of fact as to whether these investigations constituted adverse employment actions.

Defendants complain that Plaintiff and his wife were never disciplined or terminated because of these investigations. But Defendants appear to be urging exactly what *Burlington Northern* rejected; that is, the Supreme Court has specifically found that adverse employment actions are not limited to "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating." *Id.*, 548 U.S. at 60, 67, 126 S. Ct. at 2410, 2414.

Further, contrary to Defendants' arguments, numerous cases have recognized that investigations can constitute adverse employment actions. *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 436 (N.D.N.Y. 2009), *abrogated on other grounds by Widomski v. State U. of New York (SUNY) at Orange*, 748 F.3d 471 (2d Cir. 2014) (holding that an investigation was an adverse employment action); *Richardson v. New York State Office of Mental Health*, No. 11-1007, 2014

WL 3818928, at *7 (N.D.N.Y. Aug. 4, 2014) (relying on *Lee* and rejecting defendants' contention that plaintiff did not suffer an adverse employment action because he " 'was never disciplined following the interrogation' ");  *Hough v. Texas Dep't of State Health Servs.--Meat Safety Assur. Unit*, No. 10-2206, 2012 WL 3756536, at *2 (S.D. Tex. Aug. 28, 2012) (relying on *Lee*, indicating that investigations can constitute adverse actions, and finding questions of fact on retaliation claims by two plaintiffs).  These cases recognize that "[b]eing investigated by one's employer could deter a reasonable person from complaining about discrimination because investigations can be intrusive and intimidating." *Lee*, 603 F. Supp. 2d at 436; *Richardson*, 2014 WL 3818928, at *7 (quoting *Lee*).

Other cases indicate that an investigation can constitute an adverse employment action, depending on the circumstances.   The Court finds these cases particularly persuasive.

For example, in *Williams v. Guilford Technical Community College Board of Trustees*, 117 F. Supp. 3d 708 (M.D.N.C. 2015), the court concluded that a *pro se* plaintiff had plausibly stated a claim for retaliation when he alleged that he was "being secretly recorded after he gave notice . . . that he was going to file an EEOC charge" and the Court inferred that his employer at some point informed him that he was being watched." *Id.* at 721. The Court stated: "Secretive surveillance and heightened scrutiny of an employee can constitute adverse employment actions for retaliation purposes." *Id.* (collecting cases).  While Plaintiff does not link his invasion of privacy claim with his retaliation claims, *Williams* at the very least demonstrates that, contrary to Defendants' assertions, particularly harsh investigations that involve "heightened scrutiny" can constitute an adverse employment action.

Similarly, in *Szeinbach v. Ohio State University*, 493 F. App'x. 690, 695–96 (6th Cir. 2012), the Court found that a professor suffered an adverse employment action from an

investigation when, before the investigation into her alleged misconduct even began, a "whistleblower" " 'emailed faculty all over the country stating that [plaintiff] committed research misconduct" and the heads of her department " 'condoned, tolerated, or encouraged [the whistleblower's] acts of retaliation.' " *Id.* (citations omitted). Further, the investigation "spanned almost two years, [and] had a significant negative impact on her professional advancement." *Id.* Just as the *Szeinbach* plaintiff was unjustifiably punished before an investigation even began, here a reasonable juror could conclude that a decision was made to urge an investigation with the police and thus punish the Plaintiff despite no findings of wrong doing.

Moreover, in *Ross-Caleb v. City of Rochester*, 836 F. Supp. 2d 114, 128 (W.D.N.Y. 2011), *aff'd as mod.* 512 F. App'x 17, 2013 WL 599554, *aff'd in part, rev'd in part* 708 F.3d 102, the district court held as to one plaintiff:

> With respect to plaintiff's contention that she was investigated for improper use of overtime, there is no allegation or evidence that plaintiff was disciplined for alleged improper use of overtime, or that she was singled out for this scrutiny. Accordingly, plaintiff has failed to establish that the investigation constituted an adverse employment action.

*Id.* The Second Circuit affirmed with respect to this plaintiff "for the reasons [the district judge] set forth." *Id.*, 512 F. App'x 17. *Ross-Caleb*'s reasoning applies here, as a reasonable juror could conclude that Plaintiff was "singled out for . . . scrutiny."

In sum, to demonstrate retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington N.*, 548 U.S. at 68, 126 S. Ct. at 2415 (internal citations omitted). While this Court has held that mere job scrutiny does not constitute an adverse employment action,

other cases have recognized that an investigation can, under certain circumstances, constitute an adverse employment action. This is such a case. Under these circumstances, the Court finds that Plaintiff has demonstrated a genuine issue of material fact as to whether he suffered an adverse employment action for the investigations in this case. Thus, partial summary judgment is denied.

### C. Defamation Related to Vandalism, Shooting, and Torching ATC Vehicles

#### 1.Parties' Arguments

##### i.    Defendants' Original Memorandum (Doc. 116-1)

Defendants seek dismissal of specific defamation claims related to statements Hebert allegedly made with respect to "vandalism, shooting and torching of ATC's vehicles." (Doc. 116-1 at 10). Specifically, Plaintiff alleges that, in an interview with WVUE in New Orleans, Hebert "maliciously stated that if a person was to 'connect the dots' it would be clear who vandalized the vehicle, as a way of implicating [Tingle] without saying [Tingle's] name." (Doc. 116-1 at 10 (quoting Doc. 62 ¶ 52).) Defendants argue that "Hebert did not make any such statement on WVUE (or any other news outlet . . . )" and that "Hebert did not use the term 'connect the dots' in his interview with WVUE." (Doc. 116-1 at 10.) Defendants maintain his statements did not implicate Tingle in the crimes or "insinuate that Tingle had anything to do with the crimes[.]" (Doc. 116-1 at 11.)

Defendants rely on *Bussie v. Lowenthal*, 535 So. 2d 378 (La. 1988), which provided an extensive analysis on the difference between actionable defamatory statements and permissible opinion. Defendants argue that, during the interview, "Hebert referred to certain underlying, undisputed facts" but that "Hebert did not in any way suggest Brett Tingle committed the acts of vandalism on the ATC vehicles." (Doc. 116-1 at 13.) Defendants conclude:

> Instead, Hebert merely expressed his concern for himself and his family over all of the recent events and comments made by Tingle and other ATC employees. No

reasonable juror would find this news interview defamatory toward Tingle, and, thus, this portion of Tingle's defamation claim should be dismissed as a matter of law.

(Doc. 116-1 at 13.)

### ii. Plaintiff's Opposition (Doc. 137)

Plaintiff urges that his defamation claim for the vandalism, shooting, and torching of ATC vehicles is viable. Plaintiff argues that, even if Hebert did not use the exact words "connect the dots", he should still be liable for defamation.

Plaintiff specifically points to the following language from Hebert's interview: "That's gonna be something for the investigators to determine. But I'll tell you this: that there's a numerous number of text messages . . . When you add all those things up together, if you're smart, you're gonna be concerned." (Doc. 137 at 7 (quoting Doc. 116-1 at 13).) Plaintiff asserts:

> The straightforward, common-sense interpretation of these statements is that Mr. Hebert was expressing his opinion that Mr. Tingle was involved in the crimes. The statements give rise to the inference that Mr. Hebert was aware of facts that would tend to implicate Mr. Tingle. The fact that Mr. Hebert said "that he's hoping there's no connection between the recent happenings," and stopped short of saying "Brette Tingle set my car on fire," does not negate this implication.

(Doc. 137 at 7.) Plaintiff rejects Defendants' contention that Hebert merely made his comments in response to reporters and says that this is essentially irrelevant.

Plaintiff also points to other comments made by Hebert with respect to these incidents. Specifically, Plaintiff states that Hebert's comments in the WWL article and postings on the ATC's website (according to DeJean's testimony) constitute defamation.

Based on all of this, Plaintiff contends that there are questions of fact concerning this defamation claim, regardless of whether Hebert actually used the phrase "connect the dots." Plaintiff makes an alternative argument based on the release of his text messages using the theory of "false light invasion of privacy."

22

### iii. Defendants' Reply Memorandum (Doc. 137)

Defendants begin by emphasizing that this motion deals only with a part of Plaintiff's defamation claim—"that is, the portion of the claim alleging Hebert defamed him through the press concerning Hebert's vehicle theft and burning." (Doc. 145 at 3.) Defendants note that the Court previously found that Plaintiff had stated a cause of action based on his allegation that Hebert made the "connect the dots" statement. Defendants urge that the undisputed facts show that Hebert did not make this statement to any member of the press. Defendants conclude: "Plaintiff's allegations have no factual support whatsoever. Therefore, this portion of Plaintiff's defamation claim should be dismissed." (Doc. 145 at 4.)

### 2. Analysis

" '[T]he First Amendment freedoms . . . afford, at the very least, a defense against defamation actions for expressions of opinion.' " *Bussie v. Lowenthal*, 535 So. 2d 378, 381 (La. 1988) (quoting *Mashburn v. Collin*, 355 So. 2d 879, 885 (La. 1977)). But, "the distinction between a statement of fact and an assertion of opinion is 'somewhat difficult to state in abstract terms.' " *Id.* (citing *Mashburn,* 355 So. 2d at 885). "The reason for the conceptual difficulty is that many, if not most expressions of opinion are accompanied by express or implied statements of fact." *Id.* (citing *Mashburn*, 355 So. 2d at 855–86).

In *Bussie*, the Louisiana Supreme Court laid out the rule governing opinions and defamation actions:

> A pure statement of opinion, which is based totally on the speaker's subjective view and which does not expressly state or imply the existence of underlying facts, usually will not be actionable in defamation[.] That is because falsity is an indispensable element of any defamation claim, *see Cangelosi v. Schwegmann Bros.,* 390 So. 2d 196, 198 (La. 1980), and a purely subjective statement can be neither true nor false. Of course, statements of opinion are usually not made in a vacuum, without an express or implied reference to underlying facts. Even if no facts are expressly stated, the opinion may give rise to an unspoken inference that

certain facts are true. *Mashburn,* 355 So. 2d at 885-86. For example, if a person states that "In my opinion, Mr. Smith is a thief," the inference is that the speaker is aware of facts which support his opinion. Such a statement, though couched in terms of an opinion, could certainly give rise to a defamation action.

*Id.*

"The determination of whether a statement is an assertion of fact or a mere expression of opinion should be made according to the facts of each particular case." *Bussie*, 535 So. 2d at 381; *see also Fitzgerald v. Tucker*, 98-2313 (La. 6/29/99), 737 So. 2d 706, 718 ("The question of whether a statement is one of fact or opinion depends upon the circumstances in which the statement was made, and the reasonable inferences which may be drawn from a statement of opinion will vary depending upon the circumstances of the case."). " '[T]he crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.' " *Bussie*, 535 So. 2d at 381 (quoting *Mashburn*, 355 So. 2d at 885).[1]

---

[1] The *Mashburn* court explained in greater detail:

> The distinction drawn between opinion and statement of fact has long been important at common law because most states restricted the privilege of fair comment to expressions of opinion. Although difficult to state in abstract terms, as a practical matter, the crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact. The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker did not intend to assert another objective fact but only his personal comment on the facts which he had stated. An expression of opinion occurs when the maker of the comment states the facts on which his opinion of the plaintiff is based and then expresses a comment as to the plaintiff's conduct, qualifications or character; or when both parties to the communication know the facts or assume their existence and the comment is clearly based on the known or assumed facts in order to justify the comment. Criticism is privileged as fair comment only when the facts on which it is based are truly stated or privileged or otherwise known either because the facts are common knowledge or readily accessible.

> In determining whether an expression is a statement of fact or opinion under the common law, words must be read in their context. Words which, taken by themselves, would appear to be a positive allegation of fact, may be shown by the context to be a mere expression of opinion or argumentative influence. On the other hand, if a statement, ostensibly in the form of an opinion, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed

"In order for a statement of opinion to be actionable in defamation on the ground that it gives rise to a defamatory factual inference, the factual inference created by the statement must be ascertainable by a reasonable person with some degree of certainty." *Id.* at 382–83. "Otherwise, juries would be asked to engage in guessing-games about possible uncomplimentary inferences that can be drawn from statements of opinion, and the First Amendment protections afforded in this area would become worthless." *Id.*

*Bussie* is the only case cited on this issue by the parties, so an extensive analysis of its facts and holding is warranted.  In *Bussie*, an employee of Boeing allegedly made a defamatory remark about the president of a Louisiana labor organization.  *Id.* at 379.  Specifically, the employee said: "As long as you have a man named Victor Bussie sitting in Baton Rouge, calling the shots for labor, we don't need to be in your state." *Id.* The remarks were repeated by a political candidate in a televised speech. *Id.*  The labor president filed a defamation action against the candidate and Boeing. *Id.*  The district court later denied Boeing's motion for summary judgment, and the appellate court affirmed. *Id.* at 380.

The Louisiana Supreme Court reversed, finding that the "statement at issue was not an assertion of fact.  Instead, it was a statement of opinion which did not give rise to a defamatory inference." *Id.*  After laying out the appropriate standard, articulated above, the Supreme Court stated: "The Boeing employee's assertion about what Boeing *needed,* or desired to do, was clearly an expression of opinion. Ordinary persons hearing such a statement would be likely to

---

to exist by the parties to the communication, the expression gives rise to the inference there are undisclosed facts that justify the opinion. In such a case the expression, although in the form of an opinion, in reality implies a statement of fact, which is not usually protected by the common law privilege. In order for a statement to be defended as fair comment it must be recognizable by the ordinary reasonable person as opinion and not as a statement of fact.

*Id.*, 355 So. 2d at 885–86.

understand that it was merely an expression of the speaker's opinion." *Id.* at 381–82. The

Supreme Court also found it relevant that the statement was made at a "cocktail party . . . , an

environment where it is quite the norm for speakers to express their subjective views on the

matters being discussed." *Id.* at 382. In finding no "actionable implied assertion of fact," the

Supreme Court stated:

> The only inference which we can draw from the statement is that the speaker, or
> the speaker's superiors within the company (according to the speaker's
> understanding), *for reasons unspecified and not otherwise obvious,* did not believe
> that it was in Boeing's best interest to locate its business in Louisiana while plaintiff
> is a labor leader in this state. We cannot infer *why* the speaker held this opinion,
> and do not find that the statement implies, one way or another, the *reasons* the
> employee believed that Boeing's interest was disserviced by Mr. Bussie's
> leadership presence in Louisiana.

*Id.* at 382 (emphasis by *Bussie*). The Supreme Court concluded:

> The statement simply does not give rise to any defamatory inference. It does not
> imply that the plaintiff is dishonest or disreputable. In fact, the statement does not
> necessarily give rise to any inference about Mr. Bussie that is unfavorable. While
> the speaker did not state that Bussie is a strong and effective labor leader, that
> explanation of his opinion is as plausible as any other. Defamatory words are those
> which tend to expose a person to contempt or ridicule, or which otherwise deprive
> that person of public confidence or cause injury to his reputation. *Freeman v.
> Cooper*, 414 So. 2d 355 (La. 1982). Here there was no express or implied factual
> assertion which was defamatory.

*Id.* at 382. The Supreme Court also noted "the number and character of the speculative inferences"

that plaintiff was "able to generate." *Id.* at 383 n. 7. The Supreme Court then stated: "An example

of a statement which would not require such guesswork is: 'In my opinion, Mr. Smith's dishonesty

is caused by his upbringing.' In that example, the factual inference (that the plaintiff is dishonest)

is readily ascertainable, and, if untrue, defamatory." *Id.* The Supreme Court thus reversed the

denial of summary judgment. *Id.* at 383.

Bussie clearly supports the Defendants. The key part of the interview that Plaintiff focuses

on, in full, is the following:

> [*Reporter, off camera, with soundless video of reporter and Hebert displayed:*]
> "Hebert says he is hoping there is no connection between the recent happenings, but he isn't taking any chances."
>
> [*Hebert, on camera*:] "That's gonna be something for the investigators to determine, but I will tell you this, that there is numerous number of text messages. There is one alluding to about not only bombing my office, but about shooting me. There is one where they have a picture of me in a restaurant and some of the comments and suggestions is just shot him, you know…When you add all those things together… if you are smart you are going to be concerned."

(Doc. 116-9.) Looking at the television interview through the lens of *Bussie*, the Court agrees with Defendants that ordinary persons hearing this would conclude that it is mere opinion. Hebert never implies defamatory facts; he asserts certain true facts (involving the text messages and Facebook posts) and says that these facts are cause for "concern". But "concern" is not a definitive statement or implication that Tingle is responsible for the vandalism; such a statement lacks the "express or implied factual assertion which was defamatory" and the "read[y] ascertainab[ility]" required by *Bussie*. *Bussie*, 535 So. 2d at 382. In sum, analyzing this exchange (and the interview as a whole) as the Louisiana Supreme Court would, the Court finds that summary judgment is appropriate.

For similar reasons, the Plaintiff's other bases for defamation—the WWL news article and DeJean's testimony—also fail to establish a question of fact precluding summary judgment. Again, the key part of the WWL article is as follows:

> Hebert's state vehicle was stolen at his home over the weekend and somebody apparently tried to set it on fire. He says it will be up to the investigators to determine if the incident is connected to Tingle.
>
> "We've given them all of this information so that will be up to investigators to determine if there's a connection," said Hebert.

(Doc. 137-3.) Hebert says or implies nothing defamatory in these statements; indeed, he expressly says that it is the investigators' job to determine if there is a connection. DeJean's testimony ("One I know in particular had to do with the theft of his vehicle and . . . I don't recall whether he named

him by name, but there was a heavy inference that Brette Tingle was the culprit. I believe he may have used Brette Tingle's picture in that." (Doc. 137-5 at 156)) is too vague, unspecific, and conclusory to satisfy the *Bussie* standard.

Like *Bussie*, numerous Louisiana appellate court cases have rejected a plaintiff's defamation claims on the grounds that the statements were opinions, in seemly worse situations. For example, in *Breen v. Holmes*, 2016 CA 1591 (La. App. 1 Cir. 12/7/2017); 236 So. 3d 632, defendants had made certain allegedly defamatory statements on Facebook about the plaintiff after she shot her husband, claimed she acted in self-defense, and was subsequently not prosecuted. *Id.* at 635. The statements at issue were:

> I guarantee that she had this plot in the makings for sometime. There is no doubt that she staged all the abuse charges against him knowing she could use it later. She is a wicked person.
>
> . . .
>
> The more I learn about this tragedy, the more I am convinced that Dr. Breen's death was premeditated murder and not manslaughter in a moment of passion. How, in God's name, has this woman avoided arrest? ? ? My most sincere sympathy to the Breen children that they must suffer further as they grieve the loss of their father.

*Id.* at 639. The First Circuit affirmed the dismissal of Plaintiff's claim, explaining that the statements "were posted in internet forums dedicated to discussing [the husband's] death and whether she should be criminally prosecuted"; that the defendants did not "represent[] that they [were] a legal authority on" the crimes at issue; and that the statements did not "imply that the speaker [was] privy to undisclosed facts. Rather, the evidence establishes that the statements were made against a backdrop of continuous media reports fixing the public's attention on these issues, specifically whether [plaintiff] should be criminally prosecuted for killing her husband, based on the facts being reported." *Id.* at 639–40.

Similarly, in *Ray v. City of Bossier City*, 37, 708 (La. App. 2 Cir. 10/24/03); 859 So. 2d

264, the Second Circuit affirmed the granting of summary judgment on a defamation claim by two police officers against a city councilman. The statements were made after the officers filed suit alleging that the city councilman, a police department official, and others conspired to terminate the officers' employment because the officers made statements about the councilman and official driving under the influence of alcohol. *Id.* at 268–69, 276–77. According to the defendants, the plaintiff-officers allegedly "solicited other officers to make a stop or arrest of" the councilman and official for driving under the influence, and this led to an internal affairs investigation. *Id.* at 269. The appellate court summarized the city councilman's allegedly defamatory statements as follows:

> One of the alleged defamatory statements made by [the councilman] was made on March 23, 2001; he was quoted in *The Times* as referring to plaintiffs as "two rogue cops caught breaking the law." [Plaintiff] was also quoted in *Bossier Press Tribune* on March 26, 2001, as stating, "[W]hat you have here are vigilante rogue cops hunting people down. It doesn't get any dirtier than that." Finally, during an interview with a local television news reporter, [Plaintiff] stated:
>
>> "Leadership is a contact sport. It's garbage like this that keeps people from participating in public service. These officers have a hard time following departmental procedure and also have trouble telling the truth."

*Id.* at 274–75. The Second Circuit explained:

> While such comments are likely upsetting to the subjects to which they refer, the United States Supreme Court has stated that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S. Ct. 710, 721, 11 L. Ed. 2d 686 (1964). We find that [the councilman] was not attempting to assert objective facts about [the policemen]; instead, he was stating his own personal comments [(i.e., opinion)] about the two men. Therefore, [the councilman's] speech was constitutionally protected.

*Id.* at 275.

While both of these decisions obviously depend on the unique facts of the case, they reinforce the Court's conclusion that summary judgment is warranted. Both *Ray* and *Breen* arguably involve even more defamatory statements with arguably even stronger inferences, yet

both appellate courts concluded that the plaintiffs' claims failed.  For the same reasons, the Court finds that partial summary judgment on this issue is appropriate, and Plaintiff's defamation claim related to the vandalism, shooting, and torching of the ATC vehicles is dismissed**.**

V.    **Conclusion**

Accordingly,

**IT IS ORDERED** that *Defendants' Motion for Partial Summary Judgment* (Doc. 116) filed by Defendants Troy Hebert and the ATC is **GRANTED IN PART** and **DENIED IN PART**.  The following claims of Plaintiff Brette Tingle are **DISMISSED WITH PREJUDICE**: (1) the retaliation claim related to the *Randall Kling* litigation; and (2) the defamation claim related to the vandalism, shooting, and torching of ATC vehicles. In all other respects, Defendants' motion is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>April 16, 2018</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**